ODOM, Justice.
 

 The plaintiff, Patton, owns the N. E. % of N. W.
 
 Vi,
 
 Sec. 32, T. 20 N. R. 3 East, which he purchased from Frost-Johnson Lumber Company on August 10, 1918. The other plaintiff owns the N. E. % of the S. E. %, Sec. 29, same township and range, • which he acquired by purchase from H. L. Pace on September 9, 1926, Pace having acquired the same from Frost-Johnson Lumber Company on October 6, 1919.
 

 Patton is now and has been in peaceable possession of the property since the day he purchased it. McLeod has held possession since he purchased from Pace, and Pace held possession from the day he purchased from Frost-Johnson to the day he sold to McLeod.
 

 Plaintiffs allege that they are the sole owners of the land above described, together with the oil, gas, and other minerals beneath its surface; that whereas Frost-Johnson Lumber Company, their author in title in the deed whereby it parted with title to the lands, did not sell, but reserved for itself and assigns
 
 *919
 
 all the oil, gas, and other minerals in and under the lands, such reservation amounted to nothing more than a servitude upon the land for the purpose of exploring it for such minerals, and that, inasmuch as neither the Frost-Johnson Lumber Company nor its assigns has explored, or attempted to explore, their lands for the purpose of reducing such minerals to possession, and more than ten years having elapsed since the reservation was made, the servitude has prescribed.
 

 They allege further that in 1920 the Frost Lumber Industries, successors to Frost-Johnson Lumber Company and the Federal Petroleum Company, sold .the gas and gas rights in all of said land to the Union Power Company, which in turn assigned said gas rights to the Interstate Natural Gas Company, and that each of said acts of transfer is recorded in the notarial records of Union parish where the land is situated, and are clouds upon their title.
 

 They pray for judgment recognizing them to be the owners of the oil, gas, and other minerals in and under said lands; that their plea of prescription be maintained and for cancellation of said reservation and all such contracts and assignments relating to the oil and gas as may have been made by Frost-Johnson or its assigns.
 

 Defendants in answer set up that the reservation of the minerals made in the deeds by Frost-Johnson was not intended to be, and did not create, a servitude on the lands, but was merely a reservation to protect a servitude on the lands which Frost-Johnson had created thereon in favor of the Federal Petroleum Company, previous to the date on which the lands were sold to plaintiffs. They further alleged that the servitude thus created on the lands was exercised within a period, of ten years, and was then being exercised,, and therefore not prescribed.
 

 Plaintiffs’ demands were rejected by the-trial court, and they appealed.
 

 1. The Frost-Johnson Lumber Company-owned approximately 30,000 acres of land in-townships 20 and 21, ranges 3 and 4 east, in. Union parish, including the lands now owned-by these plaintiffs. The lands were not in a-solid block, but formed one continuous tract, so that one could go from any portion of the-tract to any other portion of it without passing over the lands of another. Lee v. Giauque, 154 La. 491, 97 So. 669.
 

 On January 12, 1917, prior to the date on-which Frost-Johnson sold the lands now owned by these plaintiffs, it established by convention a mineral servitude on all the-lands it owned, including that now owned by-plaintiffs, in favor of the Federal Petroleum. Company. On December 23, 1920, the Federal Petroleum Company, in conjunction with the Frost-Johnson Lumber Company,' or its assigns, conveyed to the Union Power Company the gas and gas rights to the same land, and in turn the Union Power Company assigned the same to the Interstate Natural Gas Company, the present owner.
 

 Plaintiffs in their pleadings make no mention of the servitude created by Frost-Johnson in favor of the Federal Petroleum Company on January 12, 1917, before they acquired their -lands. The servitude they refer to is one alleged to have been created by the reservation made by Frost-Johnson in its deed to them, which is as follows:
 

 
 *921
 
 “The grantor does not sell but reserves for 'itself and assigns, all of the oil, gas and other minerals and mineral rights, whether metalie ■or non-metalie, in and under the lands described herein, with the perpetual right of .ingress and egress to and from said land for the purpose of drilling, exploring and mining and in every way operating for such minerals -and removing the same.”
 

 Then follow stipulations with reference to rights of way, buildings, derricks, etc., and .finally the following:
 

 “This sale is also made subject to all the 'terms, conditions and rights in a certain operating contract of date of Jan. 12, 1917, between Frost-Johnson Lbr. Co. of Missouri, the Frost-Johnson Lumber Company of Texas •and the Union Saw Mill Company of Arkansas -of the one part, and the Republic Production Company of Texas and the Federal Petroleum ■Company of Louisiana of the other part.”
 

 The “operating contract” referred to was ■entered into on the same day that Frost-■Johnson created the servitude in favor of the Federal Petroleum Company and was attached to that instrument, but not recorded "with it.
 

 Mineral servitudes may be established by reservations such as the above, but, in view of the second paragraph quoted, it is •clear that Frost-Johnson, plaintiffs’ vendor, ■did not intend by that reservation to establish a servitude, but to protect the one already established. In fact, it could not, if it had so intended, create one in favor of itself to the prejudice of the one it had theretofore granted. Therefore the servitude which now covers plaintiffs’ lands, if any, is the one created thereon by Frost-Johnson pri- or to the date on which he sold to plaintiffs. That is the one which defendants claim they have exercised by drilling.
 

 The servitude created by Frost-Johnson Lumber Company on January 12, 1917, in favor of the Federal Petroleum Company, and which has passed by mesne conveyances to the present owners, covered this entire 30,000-acre tract. Every 40-acre subdivision of it, including the lands now owned by plaintiffs, was incumbered by that servitude the moment it became effective between the grantor and the grantee. From that moment the grantee and its assigns were vested with the absolute right to develop for minerals all or any part of the land. The owner of the servitude had ten years in which' to exercise its right. If not exercised within that time, the right or servitude was lost. If exercised within that time by exploring for and producing minerals, the servitude was perpetuated, at least for so long a time as used.
 

 The owners of this servitude did exercise it by drilling and producing gas within the ten-year period. While no well was ever drilled on the particular land owned by these plaintiffs, yet at least ten producing gas wells have been drilled on other portions of this large continuous tract, eight of which within ten years from the date on which the Federal Petroleum Company acquired its servitude on January 12, 1917. The nearest producing well to plaintiffs’ property is approximately three miles. The others are from four to ten miles away. But, as we have stated, they are all on the same -continuous tract of land of which plaintiffs’ lands form a part.
 

 In Lee et al. v. Giauque, 154 La. 491, 97 So.
 
 *923
 
 669, we held that the exercise of a servitude on any part of a continuous tract of land where the servitude covers the whole tract preserves the servitude on the entire tract; the reason being that there is but one servitude.
 

 This holding is not criticized by counsel, but is conceded to be sound. But they say that the holding in that case to the effect that development of any part of a continuous tract preserves the servitude on every part thereof has no application to the case at bar. The basis of their contention is that, so long as Frost-Johnson owned all the lands in fee, there was but one estate; but that, when he sold the lands now owned by plaintiffs, thereby dismembering the original estate, thereafter there existed, not one, but three separate estates, one consisting of all the lands not sold and the other two of the separate tracts sold; and that, when the original tract was divided into separate estates, the servitude which originally operated on one tract or estate thereafter operated over separate estates. Hence they argue that servitudes, such as the right to explore land for minerals, when extending over separate tracts of land, constitute separate and distinct servitudes; .there being as many servitudes as there are tracts of land, and, that the exercise of the servitude over one tract will not preserve it over the others.
 

 . We held that in the case of Lee et al. v. Giauque, supra. But in that case the mineral servitude was created by the vendor of certain lands who reserved to himself all the minerals which might be under the lands sold with the right to mine them. The lands sold were not adjacent, did not form one continuous tract, and, because of that fact, it was. held that there were separate and distinct servitudes covering each of the tracts sold. It was further held that the exercise of the-servitude on one of the tracts did not preserve it as to the others.
 

 That ease has no application to the one at bar. In that case there were originally separate tracts of land, and originally separate- and distinct servitudes. The servitudes were-created by the reservations made by the vendor of the lands. The moment the reservations were made there sprang into existence-as many servitudes as there were tracts of' land sold.
 

 In the case at bar, there was originally but one continuous tract of land owned in fee-by Frost-Johnson. Before the tract was dismembered by the sale of part of it, while it. was but one tract, Frost-Johnson, the owner, established by convention a mineral servitude-over the entire tract in favor of the Federal Petroleum Company. There was but one-tract of land and but one servitude. The establishment of that servitude by the owner of the tract in favor of the Federal Petroleum Company vested in it and its assigns the right to explore every acre of the land for minerals.. Being the owner in fee, Frost-Johnson Lumber Company had the right, of course, to thereafter divide its lands into as many tracts as it saw fit. But, the servitude having been created and having already attached to all the-lands, it was then beyond its power to dismember the servitude itself. The sale of the-land to plaintiffs did not have the effect of creating new or additional servitudes covering the separate tracts. The servitude originally created by Frost-Johnson was an in
 
 *925
 
 cumbrance on tbe entire tract when it sold to plaintiffs. It incumbered and bound the entire tract like a mortgage or a lease.
 

 If Frost-Johnson had mortgaged all its property to the Federal Petroleum Company, certainly a subsequent sale by it of a portion of the tract would not have had the effect of dividing the mortgage or of creating a separate mortgage on the tracts sold. The same is true of a servitude such as this one. By the sales to plaintiffs, Frost-Johnson created additional or separate tracts of land, but did not create additional or separate servitudes.
 

 The effect of a sale of all minerals in and under lands or the reservation of them when land is sold, with rights and privileges of mining them, is to impose upon the land a real right in the nature of a servitude. This has been held so many times by this court that citation of the eases is unnecessary.
 

 Counsel for plaintiffs and those who filed brief as amicus curia repeatedly refer to the right of exploring for minerals as a servitude. • Servitudes whether of this nature or not, are charges or incumbrances which follow the land into whatever hands it may go.
 

 Article 2015 of the Civil Code provides that:
 

 “Not only servitudes, but leases and all other rights, which the owner had imposed on his land before the alienation of the soil, form real obligations which accompany it in the hands of the person who acquires it, although he have made no stipulation on the subject, or they be not mentioned in the act of transfer. The purchaser may, if the circumstances permit it, have relief against the seller for concealment of such charges; but the law establishes the rule that no one can transfer a greater right than he himself has, except where the neglect of some formality required by law has subjected the owner of the real incumbrance to a loss of his right, in favor of a creditor or bona fide purchaser.”
 

 The servitude in this case was a real right, a charge imposed upon the land by the owner before it was sold to plaintiffs ana which accompanied the lands when it went into their lands, and this would be true, even though Frost-Johnson had made no mention of the charge when it sold. It did, however, mention the servitude in the deed. Not only that, the act by which the servitude was established was recorded when plaintiffs purchased. Under no reasonable theory can it be said that Frost-Johnson could, by a subsequent, independent act of his own, destroy the right which it had conferred upon another.
 

 Amicus curise states in his brief that there is no difference in principle between the case of Arent v. Hunter (on rehearing), 171 La. 1059, 133 So. 157, and the case at bar. There is wide difference, and it is this: In that ease there were five separate, noncontiguous tracts, and it was held that there were as many servitudes as there were tracts, and that the exercise of the servitude on one of them did not constitute an exercise on the others as regards prescription; following Lee v. Giauque, supra.
 

 Paragraph 9 of the syllabus to amicus eurise’s brief reads as follows:
 

 “Servitudes are limited and extinguished by the right of him who established them. R. C. C., art. 822.”
 

 This is not a literal quotation of any part
 
 *927
 
 of article 822 of the Civil Code, nor does it correctly suggest the meaning of that article.
 

 That article provides that “servitudes are, in fine, extinguished by the
 
 destruction
 
 of the right of him who established them.” (Italics ours.) Then follows the reason: “For no one can transmit to another more right than he has himself; from thence it follows, that if any one establish a servitude on an estate in which he has only a right suspended by a condition, or defeasible at a certain time or in certain cases, or subject to rescission, the servitude becomes extinguished with his right.”
 

 The right which Frost-Johnson had to establish this servitude was never destroyed. When it established the servitude, its right was not suspended by a condition, it was not “defeasible at a certain time” or “subject to rescission.”
 

 It is therefore perfectly clear that the provisions of this article do not support counsel’s contention.
 

 Stress is laid on the fact that the original estate was divided when Frost-Johnson sold to plaintiffs. In their supplemental brief, counsel for plaintiffs say that the issue here involved should not be solved by the holdings in the Giauque and Hunter Cases, supra, “but by the principles of law expounded in the Civil Code,” and they cite articles‘776 and 803.
 

 Article 776 reads as follows:
 

 “If the estate
 
 for
 
 which the servitude has been established,
 
 comes to be divided,
 
 the servitude remains due for each portion, provided that no additional burden accrue thereby to the estate which is subject to the servitude.” (Italics ours.)
 

 Article 803 is as follows:
 

 “When the estate
 
 to wtUch the servitude is due,-
 
 ceases to be undivided, by means of a partition, each of those who were the co-proprietors, only preserves the servitude by the use he makes of it, and the others lose it by non-usage during the time required for prescription.” (Italics^ ours.)
 

 These articles are found in the Code under the general heading “Of Predial Servitudes or Servitudes of Land,” and have reference only to such servitudes.
 

 “A real or predial servitude is a charge laid on an estate for the use and utility of another estate belonging to another owner.” Civ. Code, art. 647.
 

 “From the definition contained in the preceding article it follows that to establish a predial or real servitude, there must first be two different estates, one of which owes the servitude to the other.” Civ. Code, art. 648. These are servitudes which the. owner of an estate- enjoys on a neighboring estate for the benefit of his own.
 

 These articles have reference to servitudes due by one estate to another estate. Article 776 speaks of an estate “for which the servitude has been established,” and article 803 of an estate “to which .the servitude is due.” The former article says that, when such es-state “comes to be divided, the servitude remains due for each portion,” and the latter that, when the estate to which a servitude is due “ceases to be undivided [that is, when it is'divided], by means of a partition,” each of those who were proprietors preserves the servitude by the use he makes of it. What these articles mean is that, if two or more
 
 *929
 
 persons who own in indivisión an estate
 
 to which a servitude is due,
 
 or for which it has been established (such as that of natural drain), partition the same in kind, each of the parts is still due the servitude originally due the whole estate. But, after the partition, the respective proprietors can preserve the servitude as to his estate only by making use of it. Either or both will lose it by nonusage during the time required for prescription.
 

 Manifestly these articles have no application to the issue involved in this case.
 

 The judgment appealed from is affirmed, with all costs.
 

 ST. PAUL, J., absent on account of illness, takes no part.